IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| PRISCILLA MONTOYA, as administrator of the estate of decedent, MIGUEL VEGA, and on behalf of decedent's next of kin, <br><br> Plaintiff, <br><br> vs. <br><br> The CITY OF CHICAGO, Illinois, a municipal Corporation, and Chicago Police Officers Matthew KRZEPTOWSKI #14255 and Zachary KUTA #12263, <br><br> Defendants. | ) ) ) ) ) ) ) ) 21 CV 4596 ) ) ) Judge ) ) ) Magistrate Judge ) ) |

## COMPLAINT

PRISCILLA MONTOYA, as administrator of the estate of decedent, MIGUEL VEGA, and on behalf of decedent's next of kin, by and through her attorneys, makes the following complaint against Defendants CITY OF CHICAGO, Illinois and Chicago Police Officers Matthew KRZEPTOWSKI #14255 and Zachary KUTA #12263 (collectively, "Defendant OFFICERS"):

### JURISDICTION and VENUE

1. This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution as well rights protected by Illinois common law.

2. This Court has jurisdiction over the action pursuant to 28 U.S.C. §§1331, 1343 and 1367.

3. Venue is proper under 28 U.S.C. §1391(b). The events giving rise to the claims asserted in this complaint occurred within this district.

### PARTIES

4. At the time of his death, decedent MIGUEL VEGA was 26-years-old.

5. Plaintiff PRISCILLA MONTOYA and decedent MIGUEL VEGA had two young children,

VEGA's next of kin, F.V. and J.V. MONTOYA brings this action as Administrator of VEGA's estate and as legal guardian of VEGA's next of kin.

6. At all relevant times, Defendant OFFICERS are or were Chicago police officers, employed by Defendant CITY, acting under color of law and within the scope of their employment.

7. Defendant CITY is a municipal corporation duly incorporated under the laws of the State of Illinois, and was at all relevant times the employer and principal of Defendant OFFICERS. Should Plaintiff prevail on her claims, Defendant CITY is liable to Plaintiff as the principal on her state law claims pursuant to the doctrine of *respondeat superior*, and must indemnify Defendant OFFICERS on her federal claims pursuant to 745 ILCS 10/9-102.

**FACTS**

8. On the evening of August 31, 2020, at approximately 10:45 p.m., Decedent MIGUEL VEGA was walking on the sidewalk in the Pilsen neighborhood near West 19th Street and South Loomis Street in Chicago, Illinois.

9. Also on the evening of August 31, 2020, Defendant OFFICERS were on duty and driving in an unmarked Chicago police vehicle.

10. At approximately 10:45 p.m., while Defendant OFFICERS were driving near West 19th Street and South Loomis, on information and belief, an unknown individual fired a gun from somewhere on the block striking Defendant OFFICERS' police car.

11. When they heard the gunshots, everyone outside on the block began running away, including VEGA.

12. As people were running away, Defendant Officer KRZEPTOWSKI repeatedly fired his service weapon towards civilians, on a residential block, without a clear target and without knowing who was in his line of fire.

13. On information and belief, Defendant KUTA did not fire his weapon.

14. On information and belief, Defendant KUTA was near Defendant KRZEPTOWSKI, and had an opportunity to intervene to stop Defendant KRZEPTOWSKI from recklessly discharging his weapon towards unarmed civilians, but he did not take any steps to intervene and protect decedent or others.

15. Decedent Miguel VEGA was struck in the back of the head by a bullet from Defendant Officer KRZEPTOWSKI's gun.

16. When he was shot, VEGA was approximately 100 feet away from Defendant Officers and their police car.

17. VEGA was doing nothing illegal.

18. VEGA did not do anything to justify Defendant KRZEPTOWSKI's shooting at him.

19. VEGA was unarmed.

20. KRZEPTOWSKI fired his service weapon on a public street with civilians in the line of fire in reckless disregard for innocent bystanders who were outside, such as the VEGA and others.

21. VEGA did not immediately die.

22. VEGA sustained grave physical and emotional injuries prior to his death and he endured great pain and suffering before he died.

23. This shooting was a reckless, unjustifiable, and unreasonable use of force by Defendant KRZEPTOWSKI.

24. VEGA was eventually transported to the hospital where he died of his injuries.

25. The killing of VEGA by Defendant KRZEPTOWSKI was without lawful cause or justification.

26. VEGA is survived by two minor sons, F.V. and J.V., who are his next of kin.

27. F.V. and J.V. have suffered and will continue to suffer grief, emotional pain and suffering, a loss of society, comfort, love, affection, support, protection, and other damages that have resulted from their father's death.

28. The acts described above by Defendant KRZEPTOWSKI were willful and wanton and done with reckless indifference to and/or callous disregard for VEGA's health and safety and his life.

### The City of Chicago's Biased and Broken Police Accountability System

29. The Chicago City Council has long been aware of the disciplinary failures plaguing the Chicago Police Department. At an October 2007 meeting of the Council's Committee on the Budget and Government Operations, a Council member remarked of the Office of Professional Standards ("OPS") that "there is no follow-up [of citizen complaints], and I think we have to move beyond the code of silence and the protection of the police officers and command staff at any cost."

30. One study demonstrated that from 2001-2006, only 0.2% of complaints against Chicago police officers were meaningfully sustained (resulting in a suspension of a week or more), with 662 officers having 11 or more complaints against them. The same study indicated that a brutality complaint was 94% less likely to be sustained in Chicago than in the rest of the nation.

31. In 2007, and in response to growing concern about the lack of police accountability in Chicago, the City Council enacted an ordinance in 2007 to replace OPS with a civilian-run agency called the Independent Police Review Authority ("IPRA").

32. However, the five-year collective bargaining agreements entered into by the City of Chicago with the Fraternal Order of Police pre- and post-IPRA contained identical provisions preserving and protecting police officers in disciplinary investigations and preventing much needed police accountability for officer misconduct such as a "Bill of Rights" affording an accused officer certain rights that act as a barrier to police accountability, such as restrictions on the investigation of anonymous complaints; and limitations on the use of previous un-sustained complaints against an officer in subsequent disciplinary actions.

33. OPS investigators simply became IPRA investigators.

34. For years, IPRA used the OPS manual as its operational manual.

35. For all intents and purposes, IPRA was a continuation of OPS.

36. Like OPS, IPRA was largely an agency that served to protect police officers. It failed to fairly and impartially investigate citizen complaints and it failed to promote its stated purposes of transparency and police accountability.

37. From 2007 to 2015, IPRA investigated nearly 400 police shootings and found only one to be unjustified.

38. On December 9, 2015, former Chicago Mayor Rahm Emanuel delivered a speech to the City Council in which he admitted that a code of silence exists and has long existed within the Chicago Police Department, stating "[t]his problem is sometimes referred to as the thin blue line. Other times it is referred to as the code of silence. It is the tendency to deny. It is the tendency to ignore. It is the tendency in some cases to cover-up the bad actions of a colleague or colleagues."

39. During that speech, Emanuel admitted that "[s]upervision and leadership in the police department and the oversight agencies that were in place failed," and that "Our city has been down this road before."

40. Emanuel created a task force to investigate both CPD and IPRA, headed by current Mayor Lori Lightfoot, and it was called the "Police Accountability Task Force" ("PATF").

41. In April 2016, the PATF found that IPRA "investigations are riddled with structural, cultural and procedural problems that cast doubt on the intentions and integrity of the investigating agencies and the larger oversight system. Misconduct goes uninvestigated despite the availability of information about these incidents; investigations are hampered by unreasonable and unjustified procedures; and the investigative agencies lack the resources and support to be effective, and show troubling signs of bias." *See PATF Report*, at pg. 77.

42. In 2016, in the wake of the Laquan McDonald scandal which ultimately resulted in the removal

of the Mayor, the State's Attorney, the Superintendent of Police and the head of IPRA, the City of Chicago again rebranded the agency tasked with investigating improper use of force allegations by its police officers. It is now called the Civilian Office of Police Accountability ("COPA").

43. The United States Department of Justice ("DOJ") also undertook an investigation of the Chicago Police Department and released a report with its findings in January 2017.

44. The DOJ report concluded that "CPD officers engage in a pattern or practice of using excessive force that is unjustified, disproportionate, and otherwise excessive." *See DOJ Investigation of Chicago Police Department Report*, at pg. 11.

45. The DOJ concluded that IPRA did not adequately investigate allegations of police misconduct. For example, the DOJ report found that IPRA sustained fewer than 2% of the 30,000 police misconduct complaints Defendant CITY received from 2011 to 2016. *Id.*, at pg. 7

46. The DOJ report also found that IPRA investigations were biased in favor of police officers accused of misconduct. *Id.* at pg. 67.

47. The DOJ report concluded that "IPRA's deficiencies…played a central role in allowing patterns of unconstitutional force to persist." *Id.* at pg. 6.

48. The DOJ report also found that CPD failed to train and supervise its officers when it came to use of force. Specifically, the DOJ found that "CPD has not provided officers with adequate guidance to understand how and when they may use force, or how to safely and effectively control and resolve encounters to reduce the need to use force." *Id.* at pg. 5.

49. The DOJ found "repeated incidents where officers exhibited poor discipline in discharging their weapons, reflecting disregard for innocent bystanders and constitutional standards." *Id.* at pg. 28.

50. The DOJ report became the basis of a legal action instituted against Defendant CITY by the

Illinois Attorney General's Office, which led to a consent decree intended to reform the Chicago Police Department.

51. In January 2019, Defendant CITY entered into a court-approved consent decree intended to reform the Chicago Police Department.

52. An Independent Monitoring Team ("IMT"), overseen by Judge Robert M. Dow, Jr., assesses the City and CPD's compliance with the Consent Decree in biannual reports. (Each report assesses a portion of the paragraphs of the Consent Decree and will assess all paragraphs at the end of three years.) The IMT has so far issued three reports with a clear trend across all three: the City and CPD have failed to comply with the reform schedule. In the first report, the City and CPD failed to meet even preliminary compliance standards for 52 of 67 paragraphs of the Consent Decree. The City and CPD missed 37 of 50 deadlines. The City's record in the second report was no better. In that report, filed on June 18, 2020, the City and CPD missed 52 of 74 deadlines. Finally, in the third report, filed on April 8, 2021, the City and CPD missed 24 of 43 deadlines.

53. CPD continues to fail at reforming its unconstitutional practices and the City of Chicago continues to be deliberately indifferent to its failures.

54. CPD's unconstitutional policies and practices operate in situations like what happened in this case to encourage officers to shoot first and ask questions later, like Defendant KRZEPTOWSKI.

55. The systemic failures by the City of Chicago to impartially investigate allegations of excessive force by its police officers; its long history of failing to discipline its officers for improper uses of force; and its failures meaningfully train or supervise its officers on acceptable uses of force, including deadly force, have all contributed to the continued uses of excessive force in the Chicago Police Department. These failures by the City have encouraged officers like

7

Defendant OFFICERS in their belief that they can engage in misconduct without suffering any consequences.

## COUNT I
(42 U.S.C. § 1983, Excessive Force)

56. Each of the preceding paragraphs is incorporated as if fully restated here.

57. As described above, Defendant KRZEPTOWSKI subjected VEGA to excessive force in violation of the Fourth Amendment to the United States' Constitution.

58. Defendant KRZEPTOWSKI's conduct was objectively unreasonable under the totality of the circumstances.

59. Defendant Officer KUTA was aware of his partner's misconduct, had a reasonable opportunity to intervene and stop it, but failed to do so.

60. As a direct and proximate result of Defendant OFFICERS' acts or omissions, VEGA experienced severe physical and emotional pain and suffering prior to his death, the loss of life, and his estate has incurred medical and funeral expenses.

**WHEREFORE,** MONTOYA, as administrator of the estate of VEGA, prays for a judgment against Defendant OFFICERS in a fair and just amount sufficient to compensate VEGA's estate for the injuries he suffered, plus punitive damages, as well as costs, attorneys' fees, and such other relief as is just and equitable.

## COUNT II
(Policy Claim – Defendant CITY)

61. Each of the preceding paragraphs is incorporated as if fully restated here.

62. The misconduct of Defendant OFFICERS alleged above was undertaken pursuant to the policy and practice of Defendant CITY of Chicago.

63. As a matter of both policy and practice, Defendant CITY encourages the type of police misconduct at issue in this case by failing to supervise, train, investigate, and/or discipline

8

Chicago police officers, and these failures constitute deliberate indifference.

64. The following of Defendant CITY's policies and persistent widespread customs and practices were the driving force behind Defendant OFFICERS' misconduct and caused harm to VEGA:

   a. The CITY has failed to adequately and impartially investigate Chicago police misconduct for decades.

   b. The CITY has failed to properly or meaningfully discipline its police officers for uses of excessive force.

   c. The CITY has failed to properly or meaningfully train its officers on acceptable uses of force, including deadly force.

   d. The CITY has failed to properly or meaningfully supervise its officers on their uses of force, including deadly force.

65. These policies, practices, or customs of Defendant CITY individually and collectively, have been maintained and/or implemented with deliberate indifference by Defendant CITY, encouraging and allowing Defendant OFFICERS to commit the wrongful acts they did in this case.

66. These policies, practices, or customs of Defendant CITY individual and collectively have fostered an atmosphere and culture among Chicago police officers to shoot first and ask questions later because there will be no meaningful investigation or consequences if they get it wrong.

67. These policies, practices, or customs of Defendant CITY, individually and/or collectively, were the moving force behind Defendant OFFICERS' conduct, depriving of VEGA of his rights under the United States Constitution and his life.

   **WHEREFORE**, MONTOYA, as administrator of the estate of VEGA, prays for a judgment against Defendant CITY in a fair and just amount sufficient to compensate VEGA's estate for his damages, as well as injunctive and declaratory relief and such other relief as is just and

equitable.

## COUNT III
(740 ILCS 180/1 *et seq.*, Illinois Wrongful Death)

68. Each of the preceding paragraphs is incorporated as if fully restated here.

69. At all relevant times, Defendant OFFICERS owed VEGA the duty to refrain from willful and wanton acts or omissions that could cause him suffering or death.

70. As more fully described above, Defendant KRZEPTOWSKI breached his duty of care to VEGA by willfully and wantonly shooting on a public street from a great distance away, causing him to shoot and kill Decedent.

71. As a direct and proximate result of one or more of the foregoing willful and wanton acts and/or omissions of Defendant KRZEPTOWSKI, Miguel VEGA died on August 31, 2020.

72. VEGA was survived by his two minor sons, F.V. and J.V., who are his next of kin under Illinois law.

73. As a result of the wrongful death of VEGA, his sons have suffered and will continue to suffer profound grief as well as the loss of VEGA's support, society, and comfort in the future.

**WHEREFORE**, MONTOYA, as administrator of the estate of VEGA, prays for a judgment against Defendant CITY in a fair and just amount sufficient to compensate VEGA's sons for the damages they have suffered due to the loss of their father, and such other relief as is just and equitable.

## COUNT IV
(Illinois Survival Act Claim)

74. Each of the preceding paragraphs is incorporated as if fully restated here.

75. As more fully alleged above, Defendant KRZEPTOWSKI owed VEGA a duty to refrain from willful and wanton acts or omissions that could cause VEGA harm.

76. As more fully described above, Defendant KRZEPTOWSKI knowingly and intentionally and

without legal justification shot VEGA committing a battery against him.

77. As a direct and proximate result of one or more of the foregoing willful and wanton acts and/or omissions of Defendant KRZEPTOWSKI, VEGA suffered serious emotional and physical pain and suffering prior to his death on August 30, 2020.

**WHEREFORE**, MONTOYA, as administrator of the estate of VEGA, prays for a judgment against Defendant CITY in a fair and just amount sufficient to compensate VEGA's estate for the physical and emotional harm VEGA suffered prior to his death, and such other relief as is just and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully submitted,

PRISCILLA MONTOYA, Plaintiff and
Administrator of the Estate of Miguel Vega

By: /s Torreya L. Hamilton
    One of Plaintiff's Attorneys

HAMILTON LAW OFFICE, LLC
53 West Jackson Boulevard, Suite 620
Chicago, Illinois 60604
312.726.3173
tlh@thehamiltonlawoffice.com
Attorney No. 6229397

By: /s Damon Cheronis
    One of Plaintiff's Attorneys

LAW OFFICES OF DAMON CHERONIS
140 South Dearborn, Suite 411
Chicago, Illinois 60603
damon@cheronislaw.com